## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

CHAZ O. GULLEY,                          :
     Plaintiff,                         :
                                       :
    v.                                 :        Case No. 3:14cv1832(MPS)
                                       :
DEPUTY WARDEN IWEKA, et al.,             :
     Defendants.                        :

### RULING ON MOTION FOR SUMMARY JUDGMENT

Plaintiff, Chaz O. Gulley, is currently incarcerated at Corrigan-Radgowski Correctional Institution, in Uncasville, Connecticut. He commenced this civil rights action *pro se* by filing a complaint naming Deputy Warden Iweka, Counselor Supervisor Peterson, Captain James Watson, Lieutenants Kenny and Santopietro and Correctional Officers Griffin, Smith, Rowold, R. Crowell, and Dicosmo as defendants. The complaint alleges claims of excessive force, failure to intervene in the use of force by others, and assault and battery against all the defendants in their individual capacities. The defendants move for summary judgment. For the reasons set forth below, the motion is granted in part and denied in part.

## I.      Standard of Review

In a motion for summary judgment, the burden is on the moving party to establish that there are no genuine disputes of material fact and that it is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law," and a dispute about a material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

When a motion for summary judgment is supported by documentary evidence and sworn affidavits and "demonstrates the absence of a genuine issue of material fact," the nonmoving party must do more than vaguely assert the existence of some unspecified disputed material facts or "rely on conclusory allegations or unsubstantiated speculation." *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 44 (2d Cir. 2015) (citation omitted). The party opposing the motion for summary judgment "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Id.* In reviewing the record, the court must "construe the evidence in the light most favorable to the non-moving party and . . . draw all reasonable inferences in its favor." *Gary Friedrich Enters., L.L.C. v. Marvel Characters, Inc.*, 716 F.3d 302, 312 (2d Cir. 2013) (citation omitted).

Where one party is proceeding *pro se*, the court reads the *pro se* party's papers liberally and interprets them "to raise the strongest arguments that they suggest." *Willey v. Kirkpatrick*, 801 F.3d 51, 62 (2d Cir. 2015) (internal quotation marks and citation omitted). Despite this liberal interpretation, however, "[u]nsupported allegations do not create a material issue of fact" and cannot overcome a properly supported motion for summary judgment. *See Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000), *cert. denied*, 540 U.S. 811 (2003).

## II.    Facts[1]

On August 10, 2014, the plaintiff was confined at Cheshire Correctional Institution ("Cheshire"). At about 4:00 p.m. that day, the plaintiff and other inmates from his housing unit

---

[1] The relevant facts are taken from defendants' Local Rule 56(a)1 Statement and Exhibits attached to the Local Rule 56(a)1 Statement [ECF Nos. 47-2 through 47-12] and the plaintiff's Memorandum of Law, which includes what amounts to a combined Local Rule 56(a)2 Statement and Declaration and the attached Exhibits [ECF Nos. 55 (referring to penalties of perjury at

were walking to the cafeteria for dinner. Correctional Officer Rowold was posted at the metal detector located in the north corridor near the CC3 door and was monitoring inmate movement to the cafeteria. Officer Rowold directed the plaintiff to step out of line and return to the area near the metal detector.

Officer Rowold approached the plaintiff and removed the identification card from the plaintiff's shirt. Officer Rowold then called for additional staff support and a supervisor. He applied force to move the plaintiff to the wall of the corridor. Another officer arrived and assisted Officer Rowold in securing the plaintiff against the wall and applying handcuffs to the plaintiff's wrists. When Lieutenant Kenny arrived and observed the situation, he asked another officer to relieve Officer Rowold. Under the supervision of Lieutenant Kenny, two officers escorted the plaintiff to the restrictive housing unit dayroom.

Pursuant to an instruction by Lieutenant Kenny, a third officer conducted a controlled strip search of the plaintiff as the same two officers held the plaintiff's arms. After the strip search, officers escorted the plaintiff to a cell in the restrictive housing unit. As the officers were removing the handcuffs from the plaintiff's wrist through the trap in the door of the cell, the plaintiff made statements regarding a desire to harm or kill himself. Lieutenant Kenny then directed the officers to remove the plaintiff from the cell and to escort him back to the dayroom.

In the dayroom, officers conducted a second controlled strip search under the supervision of Lieutenant Kenny and dressed the plaintiff in a safety gown. The officers escorted the plaintiff to cell 116 in the restrictive housing unit, which had a camera to monitor the plaintiff's behavior.

---

beginning of statement of facts and including plaintiff's signature at end of fact statement), 55-1, 56-1]. *See Willey*, 801 F.3d at 62 (requiring liberal interpretation of *pro se* pleadings).

The officers placed the plaintiff in the cell with a clean mattress and a blanket and removed the handcuffs.

A nurse checked the plaintiff's wrists and jaw in response to the plaintiff's complaints of pain in those areas. Lieutenant Kenny photographed both of the plaintiff's wrists and his jaw, and placed the plaintiff on behavior observation status due to his statements of self-harm.

At approximately 4:35 p.m., correctional staff passed the plaintiff's dinner meal to him through the trap in the cell door. Very shortly after receiving his dinner, the plaintiff covered the camera in the cell, which made it impossible to view the inside of the cell. The plaintiff also covered the window in the door of the cell.

As soon as an officer noticed that the plaintiff had covered the camera and cell window, he informed Lieutenant Kenny. When Lieutenant Kenny arrived at the cell, he ordered the plaintiff to remove the covering from the window, but the plaintiff refused to do so. Lieutenant Kenny was able to open the trap in the door of the cell and observe the plaintiff standing in the corner of the cell. Lieutenant Kenny allegedly ordered the plaintiff to lie on the mattress in the cell and the plaintiff allegedly did not respond.

Lieutenant Kenny then administered a burst of a chemical agent into the cell through the trap in the cell door. Lieutenant Limmer administered a second burst of a chemical agent through the trap in the cell door. At approximately 4:42 p.m., the plaintiff removed the covering from the camera in the cell. Within seconds, Officers Griffin, Smith, Jura, and Johnson and Lieutenants Kenny and Limmer entered the cell and pinned the plaintiff to the bed. Lieutenant Kenny administered a third burst of a chemical agent into the plaintiff's facial area and Lieutenant Limmer issued a fourth burst of a chemical agent into the plaintiff's facial area. The officers

handcuffed the plaintiff behind his back, escorted him out of the cell, and permitted him to rinse his face in the shower in an effort to decontaminate him from the chemical agent residue.

Under the direction of Lieutenant Kenny, Officers Smith and Griffin escorted the plaintiff to the dayroom in the restrictive housing unit and dressed him in a clean safety gown. Based on the plaintiff's behavior and statements that he might harm himself, Lieutenant Kenny directed officers to escort the plaintiff to cell 118 in the restrictive housing unit and to place him in full stationary soft restraints. A nurse checked the restraints on the plaintiff's wrists and ankles to make sure they were not too tight. Lieutenant Kenny placed the plaintiff on behavioral observation and full restraint status.

The plaintiff remained on full restraint status until the following day, August 11, 2014, at noon. At that time, Lieutenant Kenny decided to downgrade the plaintiff from full restraint status. The plaintiff informed prison staff that he did not want to be downgraded from full, stationary restraints. As officers attempted to remove the restraints from the plaintiff's limbs, the plaintiff resisted. Lieutenant Kenny administered a burst of a chemical agent into the plaintiff's facial area. Another lieutenant administered a second burst of a chemical agent into the plaintiff's facial area. Lieutenant Kenny administered a third burst of a chemical agent into the plaintiff's facial area and the plaintiff stopped his resistance to being released from the restraints.

Plaintiff alleges that officers failed to decontaminate him properly from the residue of the chemical agent. He remained in four-point restraints in the restrictive housing unit pursuant to an order issued by Lieutenant Kenny. The plaintiff claims that for three hours, the chemical agent that had been sprayed on or at him made it difficult to breath and caused him to experience the sensation of burning up. A nurse treated the plaintiff for these symptoms.

At approximately 3:00 p.m. that afternoon, Lieutenant Kenny decided to downgrade the plaintiff to behavior observation status. Officers removed the plaintiff's restraints without incident.

On September 4, 2014, the plaintiff and three other prisoners were confined in cells in the restrictive housing unit at Cheshire. In an effort to protest conditions at Cheshire, the plaintiff and the three other inmates covered their cell windows so that prison officials were unable to see into their cells. Officer Crowell notified Lieutenant Santopietro about the conduct of the four inmates.

When Lieutenant Santopietro arrived at the plaintiff's cell, he ordered him to remove the covering over the window in the door of the cell. The plaintiff refused to comply with the order. When Lieutenant Santopietro opened the trap in the cell door, he observed that the plaintiff had draped sheets and blankets to cover the lower bunk of the cell and he could not see the plaintiff behind the sheets and blankets.

Lieutenant Santopietro directed four officers, including Officers Dicosmo, Griffin, and Crowell, to enter the plaintiff's cell. As the officers and Lieutenant Santopietro entered the cell, Lieutenant Santopietro pulled down the sheet and administered a burst of a chemical agent towards the plaintiff. The officers brought the plaintiff to the floor of the cell. Lieutenant Santopietro issued a second burst of a chemical agent towards the plaintiff as the officers shouted at the plaintiff to stop resisting their attempts to handcuff him. At the same time, the plaintiff was yelling that he was not resisting and that the officers were using excessive force against him. Eventually, one or more of the officers applied handcuffs to the plaintiff's wrists, and Officers Crowell and Griffin escorted the plaintiff to the shower for decontamination. After Officer

Crowell had decontaminated the plaintiff, he and Officer Griffin escorted the plaintiff to a cell in the restrictive housing unit. Officer Griffin applied leg irons to the plaintiff's ankles. Later that day, officers transported the plaintiff to Corrigan-Radgowski Correctional Institution.

Additional facts concerning the circumstances of each incident involving the use of force against the plaintiff are set forth below in the Discussion (Part III).

## III.    Discussion

The defendants contend that they did not use excessive force against the plaintiff on August 10, 2014, or September 4, 2014, that they were not deliberately indifferent to the plaintiff's safety, and that they are entitled to qualified immunity.

### A.    Deputy Warden Iweka

On February 26, 2015, the clerk filed a suggestion of death indicating that the Department of Correction Legal Affairs office had notified the court that Deputy Warden Iweka was deceased. (*See* Docket Entry, Feb. 25, 2015, Suggestion of Death Upon the Record.) The clerk delivered a copy of the Suggestion of Death to the plaintiff at his place of confinement. (*See id.*)

Rule 25(a), Fed. R. Civ. P., provides: "If a party dies and the claim is not thereby extinguished, the court may order substitution of the proper party. . . . If the motion [for substitution] is not made within 90 days after service of a statement noting the death, the action by or against the decedent must be dismissed." There is no requirement that the notification of death of a party be filed by a party or the formal or appointed representative of the decedent's estate or that the statement identify the successor or legal representative of the decedent. *See Unicorn Tales, Inc. v. Banerjee*, 138 F.3d 467, 469-70 (2d Cir. 1998).

7

To date, no motion for substitution of parties has been filed. Because more than ninety days have passed since the filing of the suggestion of death, the case is dismissed as to defendant Deputy Warden Iweka pursuant to Rule 25(a), Fed. R. Civ. P.

**B.      Excessive Force Claims against Remaining Defendants**

The plaintiff claims that on August 10, 2014, on August 11, 2014, and on September 4, 2014, the remaining defendants either used excessive force or were present when excessive force was used by other defendants and failed to intervene. The defendants argue that Lieutenant Kenny's affidavit, reports pertaining to the use of force, and video footage of the incidents filed in support of the motion for summary judgment show that the force used was not excessive and that they otherwise did not violate the Eighth Amendment.

In *Hudson v. McMillian*, 503 U.S. 1 (1992), the Supreme Court established the standard to be applied in determining whether force by a correctional officer against a sentenced inmate states a constitutional claim under the Eighth Amendment in contexts other than prison disturbances. When an inmate claims that excessive force has been used against him by a prison official, he has the burden of establishing both an objective and subjective component to his claim. *See Romano v. Howarth*, 998 F.2d 101, 105 (2d Cir. 1993).

To meet the objective component, the plaintiff must allege that the defendant's conduct was serious enough to have violated "contemporary standards of decency." *Hudson*, 503 U.S. at 8 (internal quotation marks and citation omitted); *see Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010) ("core judicial inquiry" is "not whether a certain quantum of injury was sustained," but rather whether unreasonable force was applied given the circumstances); *Hudson*, 503 U.S. at 9 ("[w]hen prison officials maliciously and sadistically use force to cause harm, contemporary

standards of decency are always violated" irrespective of whether significant injury is present).

The subjective component requires the inmate to show that the prison officials acted wantonly. With regard to an excessive force claim, the inmate must show that the prison officials acted "maliciously and sadistically to cause harm . . . ." *Id.* at 7. Even *de minimis* uses of force are unconstitutional if they are "repugnant to the conscience of mankind." *Id.* at 10-11 (internal quotation marks and citations omitted). The subjective component focuses on "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Id.* (citing *Whitley v. Albers*, 475 U.S. 312, 320-321 (1986)). The court considers factors including "the need for application of force, the relationship between that need and the amount of force used, the threat reasonably perceived by the responsible officials, and any efforts made to temper the severity of a forceful response." *Id.* (internal quotations and citation omitted).

### 1.    Correctional Officer Rowold – August 10, 2014 – First Incident

The plaintiff alleges that as he was walking to dinner on August 10, 2014, with his hands in his pockets, Officer Rowold gestured to him to remove himself from the line of inmates heading to the dining hall. Officer Rowold allegedly ordered the plaintiff to remove his hands from his pockets. The plaintiff claims that he stated that it was not a violation of prison directives to have his hands in his pockets. The defendants contend that the plaintiff was swearing at Officer Rowold and that he took an aggressive stance when Officer Rowold ordered him to remove himself from the line of inmates. The plaintiff claims that he did not swear at Officer Rowold or take an aggressive stance towards him.

The Defendants have has not filed an affidavit by Officer Rowald in support of the motion for summary judgment. The defendants have filed an incident report completed by Officer Rowold that has not been sworn and is barely legible. In addition, although the Defendants have filed an affidavit by Lieutenant Kenny, he was not present when the incident between the plaintiff and Officer Rowold occurred. Thus, the statements in Lieutenant Kenny's affidavit about what happened during the incident were not made on personal knowledge.

The videotape of the incident was filmed from the other end of the corridor and has no sound. Thus, it is difficult to see or hear what happened between the plaintiff and Officer Rowold. It appears from the video that Officer Rowold initially approaches the plaintiff and then retreats. Officer Rowold then approaches the plaintiff and pulls him to the wall of the corridor and holds him there as another officer comes to assist him. It does not appear that the plaintiff "squared off" against Officer Rowold, although the images in the video simply do not make this clear. Rather, it appears that the plaintiff is standing in front of Officer Rowold and then turns to rejoin the line of inmates when Officer Rowold grabs him and pulls him to the corridor wall.

Given this evidence, there are disputes about whether the force by Officer Rowold was used to restore discipline rather than to inflict harm. Furthermore, the parties disagree as to whether Officer Rowold grabbed the plaintiff's genitals during the incident and made a sexually derogatory comment to the plaintiff. *See Crawford v. Cuomo*, 796 F.3d 252, 257 (2d Cir. 2015) (clarifying its prior holding in *Boddie v. Schnieder*, 105 F.3d 857 (2d Cir. 1997) relating to sexually assaultive searches and holding that "a corrections officer's intentional contact with an inmate's genitalia or other intimate area, which serves no penological purpose and is undertaken with the intent to gratify the officer's desire or to humiliate the inmate, violates the Eight

10

Amendment"). Because there are disputed issues of material fact, the motion for summary judgment is denied as to the claims against Officer Rowold.

### 2.     Lieutenant Kenny - August 10, 2014 – Second Incident

After the incident involving Officer Rowold, Lieutenant Kenny ordered the plaintiff's placement in a cell in the restrictive housing unit. The plaintiff concedes that he made a statement about attempting to harm himself and that the decision by Lieutenant Kenny to place him on behavior observation status was appropriate. The plaintiff also concedes that after officers placed him in the cell in the restrictive housing unit, he covered the cell window and the camera in the cell to obstruct the view into the cell by prison officials and refused Lieutenant Kenny's order to uncover the window.

Lieutenant Kenny's affidavit indicates that the plaintiff was non-responsive to his orders to uncover the cell window and camera and that, in view of the plaintiff's prior statement that he would try to harm himself, it was immediately necessary to take action to ensure the plaintiff's safety. (*See* Defs.' Mem. Supp. Mot. Summ. J., ECF No. 47-11, Ex. 10, Kenny Aff. ¶ 33.) The plaintiff states that when Lieutenant Kenny arrived at the scene while the camera and cell window were covered, the plaintiff repeatedly asked to see the State Police to report the incident involving Officer Rowold.

The incident report completed by Lieutenant Kenny, which is attached to his affidavit, reflects that after the cell trap door was opened, he was able to observe the plaintiff standing up in a corner of the cell wrapped in a safety blanket. He ordered the plaintiff to remove the blanket, which, from a video submitted by the defendants, appears to have been placed over the plaintiff's head and torso, obscuring the entire upper half of his body. The plaintiff did not respond to

Lieutenant Kenny's order. (*See id.*, ECF No. 47-2, Ex. 1, Incident Report at 7.) Lieutenant Kenny reports that he then administered one burst of a chemical agent into the cell through the trap in the cell door, "which failed to gain compliance." *Id.* Lieutenant Limmer then administered a second burst of a chemical agent into the cell. According to Kenny's report, the plaintiff removed the safety blanket following the second burst of chemical agent.

Kenny then ordered Officers Smith, Griffin, Johnson and Jura to enter the cell with him to secure the plaintiff with hand restraints. According to Kenny's report, the plaintiff "refused to give up his hands," even after being ordered to do so by Kenny. At that point, Kenny administered a third burst of a chemical agent towards the plaintiff's facial area, "but was unable to hit the intended target (face and eyes)." *Id.* Lieutenant Limmer administered a fourth burst of a chemical agent towards the plaintiff's facial area, "which gained compliance." At that point, the plaintiff "released his hands," and one of the officers handcuffed him and escorted him out of the cell to the shower. *See id.* Later, after the plaintiff made further threats to harm himself, he was placed on in-cell restraints.

The plaintiff offers little evidence to dispute this version of events. He agrees that he made statements threatening to harm himself, covered the cell window and the cell camera, refused an order to uncover the cell window, and that he again made statements threatening to harm himself. (ECF No. 55 at 2-3.) As to Lieutenant Kenny's use of a chemical agent, however, he avers that "verbal intervention was never attempted by mental health staff or medical to address the plaintiff's issues or concerns before [Lieutenant] Kenny maliciously out of spite and contempt dispersed chemical agent into the plaintiff's cell." (ECF No. 55 at 3.)

The video footage of this incident filed by the defendants in support of the motion for summary judgment does not support the plaintiff's claim that Lieutenant Kenny acted "maliciously" or "out of spite and contempt." (*See id.*, ECF No. 47-3, Ex. 2, Video Segments 1 & 2.) None of the video footage is accompanied by audio. The first video taken from the in-cell camera depicts the plaintiff covering the door and, eventually, the in-cell camera itself. When the covering is removed from the in-cell camera, the plaintiff appears with a blanket covering the upper half of his body, and correctional staff can be seen entering the cell. It appears that, within a few seconds, an individual sprays the plaintiff with a chemical agent and officers pin the plaintiff to the bunk in the cell face down, handcuff the plaintiff behind his back, and escort him from the cell. *See id.*, Ex. 2, Video Segment 1. The second video, taken from a camera located at the end of the corridor outside the cell, depicts the conduct of the correctional staff outside the plaintiff's cell before entering the cell. *See id.*, Ex. 2, Video Segment 2. The footage shows correctional staff arriving at the cell door and attempting to look through the window in the cell door, other correctional staff arriving at the cell door and opening and looking through the trap in the door, , and then six staff members entering the cell. *See id.*

After considering all of the evidence in the record regarding this second incident on August 10, 2014, the Court concludes that the defendants have demonstrated the absence of a genuine dispute of material fact and their entitlement to judgment as a matter of law regarding this incident. Lieutenant Kenny's report documents that each use of force was undertaken in an effort to gain the plaintiff's compliance with lawful orders that were reasonably related to maintaining security and order. The plaintiff refused to comply with multiple orders given by Lieutenant Kenny and staff, as he acknowledges, and the entry into the plaintiff's cell and each

use of the chemical agent was prompted by such a refusal. *See Henry v. Dinelle*, 929 F. Supp. 107, 117 (N.D.N.Y. 2013) ("Corrections officers are given the lawful authority to use such physical force as may be reasonably necessary to enforce compliance with proper instructions and to protect themselves from physical harm from an inmate."). Further, it was not until after the plaintiff had repeatedly stated an intent to harm himself, blocked the camera and cell door, covered his upper body with a blanket, and then, after being taken to the shower, made further statements of intent to harm himself that Lieutenant Kenny placed him on in-cell restraints.

The plaintiff offers almost no evidence to rebut the showing made by the defendants regarding this incident, and he has failed to provide any evidence to support his conclusory statement that Lieutenant Kenny acted "maliciously and out of spite and contempt." Finally, while it may have been a helpful interim step for the defendants to summon mental health staff, as the plaintiff suggests, the failure to do so under all the circumstances does not suggest that the defendants acted "maliciously and sadistically to cause harm . . . ." *Hudson*, 503 U.S. at 7*; see also Whitley*, 475 U.S. at 321-22 ("Prison administrators ... should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security.").[1] No reasonable juror could find from the evidence in the record that the defendants violated the

---

[1] Even if, as the plaintiff suggests, summoning the mental health staff before applying force was required by the Department of Corrections' internal policies in these circumstances, by itself a violation of internal policies does not give rise to an Eighth Amendment violation. *See, e.g., Kitchen v. Ickes*, 116 F. Supp.3d 613, 629 n. 6 (D. Md. 2015) ("Regardless of any alleged violations of internal regulations, the law is settled that the failure to follow a prison directive or regulation does not give rise to a federal claim, if constitutional minima are met."). As noted, the plaintiff has failed to point to any evidence in the record that the actions of the defendants in this particular incident were undertaken maliciously and sadistically to cause harm.

plaintiff's Eighth Amendment rights as a result of the second incident on August 10, 2014. Therefore, the motion for summary judgment is granted as to that incident.

### 3.    Lieutenant Kenny - August 11, 2014 Incident

The plaintiff describes an incident that occurred on August 11, 2014, approximately twenty-two hours after officers placed him in four-point therapeutic restraints, during which Lieutenant Kenny allegedly used excessive force against him. At the time, the plaintiff was still confined in four-point restraints in the restrictive housing unit. The plaintiff avers that he resisted being removed from restraints and at that point "a chemical agent was dispersed into the plaintiff[']s facial area excessively." (ECF No. 55 at 4.) The plaintiff avers that the defendants did not take proper steps to decontaminate him and that he remained on in-cell restraints.

The defendants do not address this incident in their brief or their Local Rule 56(a)(1) statement, although Lieutenant Kenny's report does discuss it. The report states that the plaintiff attempted to kick Correctional staff while staff was attempting to remove a restraint, that Kenny ordered the plaintiff to cease, and that he then administered a chemical burst, "which failed to gain compliance." Two more bursts were administered, "which gained compliance." (ECF No. 47-2 at 8).

With respect to this incident – as to which the defendants have not properly moved for summary judgment – there remain disputed issues of fact for trial, including whether or not the plaintiff attempted to kick correctional staff, whether he remained in in-cell restraints when the chemical agent was administered, and whether "any efforts were made to temper the severity of a forceful response." *Hudson*, 503 U.S. at 7. Thus, the allegations of excessive force pertaining to the August 11, 2014 incident remain pending against the defendants.

4.      **Lieutenant Santopietro, Officers Griffin, Crowell, and Dicosmo –
September 4, 2014 Incident**

The plaintiff acknowledges that on September 4, 2014, while he was confined in a cell in the restrictive housing unit at Cheshire, he covered the window in his cell door. He claims that he was protesting the tactics used by several correctional officers when they performed strip searches on him and three other inmates confined at Cheshire. The plaintiff states that Deputy Warden Iweka, Supervisor Peterson, Captain Watson, Lieutenant Kenny, and Correctional Officer Dicosmo had been notified about the conduct of the officers or were otherwise aware of or had observed the conduct.

When Lieutenant Santopietro arrived at the plaintiff's cell, he ordered the plaintiff to remove the covering from the cell window. The plaintiff concedes that he refused to remove the covering over the window. Lieutenant Santopietro has not filed an affidavit in support of the motion for summary judgment. In the unsworn report completed by Lieutenant Santopietro after the incident involving the plaintiff on September 4, 2014, he claims that when he opened the trap in the door to the plaintiff's cell, he observed sheets covering the lower bunk. (*See* Defs.' Mem. Supp. Mot. Summ. J., ECF No. 47-9, Ex. 8, Incident Report at 3.) He was not able to see the plaintiff by looking through the trap in the cell door. *See id.*

During the video footage of the incident, which is accompanied by audio, Lieutenant Santopietro can be heard ordering the plaintiff to make himself visible and making statements suggesting that the plaintiff might be trying to harm himself. (*See* ECF No. 47-10, Ex. 9, Videotape.) No statements by the plaintiff that he might hurt himself can be heard on the video, although the plaintiff is plainly noncompliant with the orders Santopietro is giving to show himself. The plaintiff can be heard informing Lieutenant Santopietro him that he is not hurt. *See*

16

*id.* Lieutenant Santopietro indicates that he is going to come into the cell because he cannot see the plaintiff. *See id.*

Approximately three minutes after Lieutenant Santopietro's arrival at the plaintiff's cell, the video footage depicts officers entering the cell, pulling the plaintiff from the lower bunk to the cell floor to his stomach, someone spraying the plaintiff with a chemical agent, and the officers on top of and on the sides of the plaintiff engaging in a struggle as they attempt to handcuff the plaintiff behind his back. *See id.* The video stops approximately thirty seconds after the defendants enter the cell and are attempting to restrain the plaintiff. The video footage resumes after the plaintiff has been removed from the cell and is in the shower being decontaminated from the chemical agent. The officer operating the video camera states that he was unable to film the entire incident in the cell because the battery in the video camera stopped working. *See id.*

Lieutenant Santopietro's incident report includes a statement that he thought it was necessary for him and Officers Crowell, Griffin, Dicosmo and Monson to enter the plaintiff's cell because he could not see the plaintiff through the cell window and the plaintiff was hidden behind sheets on the lower bunk. (*See* ECF No. 47-9, Ex. 8, Incident Report at 3.) Lieutenant Santopietro relates that he sprayed a chemical agent at the plaintiff twice after entering the plaintiff's cell. *See id.* The plaintiff claims that Officers Griffin, Crowell, and Dicosmo kicked and punched him as he lay on the floor. The plaintiff can be heard on the video accusing the officers of beating him. The Court is unable to determine whether or not this occurred from viewing the video footage, because at critical points the backs of some officers obscure what the officers may or may not be doing to the plaintiff. Furthermore, in view of the fact that the entire

incident inside the plaintiff's cell was not captured on videotape and no affidavits were filed by Lieutenant Santopietro, Officer Crowell, Officer Griffin, or Officer Dicosmo, the Court cannot determine whether the officers used force "in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm."

There are issues of material fact in dispute regarding whether the force was used in a good faith effort to restore order or discipline. Specifically, there are disputed issues as to whether Lieutenant Santopietro reasonably perceived a threat to the plaintiff's well-being, whether there was a need for the type of force used by Lieutenant Santopietro and Officers Dicosmo, Crowell, or Griffin after they entered the cell, whether sufficient efforts to temper the severity of the forceful response were made after entering the cell, and, most plainly, whether Officers Dicosmo, Crowell, or Griffin used excessive force against the plaintiff after pinning him to the ground. Accordingly, the motion for summary judgment is denied as to the claims against Lieutenant Santopietro, Officer Crowell, Officer Griffin, and Officer Dicosmo with regard to the force used against the plaintiff on September 4, 2014.

**C.    Failure to Intervene/Deliberate Indifference to Safety Claim**

The complaint includes an allegation that the defendants were deliberately indifferent to the plaintiff during the application of force. The plaintiff claims that "all Supervisors and correction officers observed[,] [were] aware and/or utilized excessive force and/or [d]eliberate [i]ndifference." (Compl., ECF No. 1 at 6.) In addition, the last paragraph of the body of the complaint alleges that "EACH DEFENDANT HAD A DUTY TO PREVENT THE OTHER DEFENDANT FROM VIOLATING [HIS] CONSTITUITONAL RIGHTS AND EACH DEFENDANT HAD THE OPPORTUNITY TO PREVENT THE OTHER DEFENDANTS . . .

FROM VIOLATING THOSE RIGHTS." *Id.* at 7. In the initial review of the complaint, the court construed these allegations as a claim that the defendants failed to intervene to protect the plaintiff from excessive force by others.

The defendants argue that this claim fails because there are no facts to suggest that any of the individuals involved in the incidents on August 10, 2014, or September 4, 2014, were aware of any condition that presented a substantial risk of harm to the plaintiff and failed to remedy the condition. "It is widely recognized that all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994) ("It is widely recognized that all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence.") (citations omitted). Thus, a prison staff member who is present during an assault on an inmate by another prison staff member may be liable under section 1983 for any resulting constitutional deprivation, even if the staff member did not directly participate. *See Curley v. Village of Suffern*, 268 F.3d 65, 72 (2d Cir. 2001) ("Failure to intercede results in liability where an officer observes excessive force is being used or has reason to know that it will be."). To state a claim for a prison official's failure to intervene, a plaintiff must allege facts showing that: "(1) the officer had a realistic opportunity to intervene and prevent the harm; (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated; and (3) the officer [did] not take reasonable steps to intervene" to prevent the harm. *Jean-Laurent v. Wilkinson*, 540 F. Supp. 2d 501, 512 (S.D.N.Y. 2008) (citations omitted), *aff'd*, 461 F. App'x 18 (2d Cir. 2012). With regard to the first factor, "[w]hether an

officer had sufficient time to intercede or was capable of preventing the harm being caused by another officer is an issue of fact for the jury unless, considering all the evidence, a reasonable jury could not possibly conclude otherwise." *Anderson*, 17 F.3d at 557.

In support of their argument on this issue, the defendants appear to rely on an Eighth Amendment conditions of confinement standard set forth in *Farmer v. Brennan*, 511 U.S. 825 (1994). (Defs.' Mem. Supp. Mot. Summ. J., ECF No. 47-1 at 7-8.) In response to this argument, the plaintiff contends that the defendants were deliberately indifferent to him because they "were deliberately indifferent to each other['s] excessive actions." (Mem. Law Opp'n Mot. Summ. J., ECF No. 55 at 10.)

Because the court construes the plaintiff's allegations as a claim that the defendants failed to intervene to prevent an ongoing use of force by others, the standard governing an Eighth Amendment failure to intervene in the use of excessive force is applicable. The defendants have not addressed the relevant legal standard to be applied to the plaintiff's failure to intervene claims; nor have they analyzed the evidence in the record to demonstrate that there are no genuine disputes of material fact as to the failure to intervene claim. The Defendants' discussion of this entire issue occupies no more than a page of their brief. (ECF No. 47-1 at 7-8.) Thus, the motion for summary judgment is denied as to the claim that the defendants failed to intervene to stop the use of excessive force against the plaintiff on August 10 (as to the first incident only), August 11, and September 4, 2014.[2]

### D.   Qualified Immunity

The defendants argue that even if the evidence demonstrates that they violated the

---

[2] The Defendants also do not address the plaintiff's state law claims of assault and battery. (See

plaintiff's Eighth Amendment rights, they are entitled to qualified immunity because they acted reasonably during each incident. Qualified immunity "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v, Fitzgerald*, 457 U.S. 800, 818 (1982)). An official is entitled to qualified immunity unless (1) the facts alleged or shown by the plaintiff state a violation of a statutory or constitutional right by the official, and (2) the right was clearly established at the time of the challenged conduct. *See Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (citation omitted). The Supreme Court has held that district courts have the discretion to choose which of the two prongs of the qualified immunity standard to address first. *See Pearson*, 555 U.S. at 236.

Under the second prong, a right is clearly established if, "at the time of the challenged conduct . . . every 'reasonable official would have understood that what he is doing violates that right.'" *al-Kidd*, 563 U.S. at 731, 741 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). There is no requirement of a decision that is directly on point, "but existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* "[A] broad general proposition" does not constitute a clearly established right. *Reichle v. Howards*, 132 S. Ct. 2088, 2094 (2012). Rather, the constitutional right allegedly violated must be established "in a 'particularized' sense so that the 'contours' of the right are clear to a reasonable official." *Id.* (quoting *Anderson*, 483 U.S. at 640).

---

ECF No. 1 at 2.)

The defendants do not contest that at the time of the incidents in 2014, it was clearly established that force may be used to maintain or restore discipline, but not maliciously and sadistically to cause harm. *Hudson*, 503 U.S. at 9 ("[w]hen prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency are always violated" irrespective of whether significant injury is present); *Anderson*, 17 F.3d at 557 (2d Cir. 1994) ("It is widely recognized that all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence.") (citations omitted). The defendants contend that the evidence demonstrates that they did not violate the plaintiff's constitutional right during the incidents that required the use of force. As indicated above, the court has concluded that the defendants have failed to demonstrate the absence of a genuine dispute of material fact – except as to the claims regarding the second incident on August 10, 2014.

Without discussion, the defendants argue that even if the plaintiff had asserted sufficient facts to support violations of his constitutional rights, their actions were objectively reasonable. The court has concluded in previous sections of this ruling that there are issues of fact that are in dispute with regard to the reasonableness of the defendants' actions as well as any attempts to temper the amount of force used and whether the amount of force used was proportional to the need for force. The same issues of fact preclude a finding that the defendants are entitled to qualified immunity. *See Breen v. Garrison*, 169 F.3d 152, 153 (2d Cir. 1999) (issues of material fact as to excessive force claim precluded summary judgment based on a qualified immunity defense); *Maye v. Vargas*, 638 F. Supp. 2d 256, 262 (D. Conn. 2009) ("Although qualified immunity is a question of law, because issues of reasonableness depends on facts of the situation,

if there is a dispute as to the facts, that must be resolved by the factfinder before qualified immunity can be granted.") (citing *Zellner v. Summerlin*, 494 F. 3d 344, 368 (2d Cir. 2007*)); Jeanty v. County of Orange*, 379 F. Supp. 2d 533, 542 (S.D.N.Y. 2005) ("same genuine issues of material fact that preclude summary judgment on plaintiff's excessive force claim, also preclude application of defense of qualified immunity at the summary judgment stage"). For example, the defendants likely would not be entitled to qualified immunity if the evidence ultimately shows that they punched and kicked the plaintiff while he was pinned to the floor during the incident of September 4, 2014; similarly, Officer Rowold would not be entitled to qualified immunity if he grabbed the plaintiff's genitals while making obscene remarks to him on August 10, 2014.

The defendants have not met their burden of demonstrating the absence of a genuine dispute of material fact as to qualified immunity. Accordingly, the Court denies summary judgment as to qualified immunity.

## IV.   Conclusion

The case is **DISMISSED** as to defendant Deputy Warden Iweka pursuant to Rule 25(a). The Motion for Summary Judgment [**ECF No. 47**] is granted as to all defendants with respect to the second incident on August 10, 2014. The motion for summary judgment is otherwise **DENIED**. The case proceeds on the Eighth Amendment excessive force and failure to intervene claims as well as the state law claims of assault and battery against defendants Counselor Supervisor Peterson, Captain James Watson, Lieutenants Kenny and Santopietro, and Correctional Officers Griffin, Smith, Rowold, R. Crowell, and Dicosmo in their individual capacities.[3]

---

[3] The Court notes that the summary judgment papers filed by the parties do not clearly identify

SO ORDERED this 15th day of August 2016, at Hartford, Connecticut.

_____/s/_____

MICHAEL P. SHEA
UNITED STATES DISTRICT JUDGE

---

which correctional officer defendants were involved in which incidents. Thus, the Court is unable to determine whether some of the defendants have been named only for their involvement in the second incident of August 10, 2014, as to which the Court has granted summary judgment. The Court will address this issue with the parties during later proceedings.